18 MAG 2925 ORIGINAL

Approved: [signature]
SAGAR K. RAVI
Assistant U.S. Attorney

U.S. DISTRICT COURT FILED
APR 06 2018
DS
S.D. OF N.Y.

Before: HONORABLE HENRY B. PITMAN
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA :

- v. - :

GERARD SCPARTA, :

Defendant. :

- - - - - - - - - - - - - - - - x

**SEALED COMPLAINT**

Violations of
18 U.S.C. §§ 641, 1001, and 2; 42 U.S.C. § 408

COUNTY OF OFFENSE:
NEW YORK

DOC #

SOUTHERN DISTRICT OF NEW YORK, ss.:

PETER DOWD, being duly sworn, deposes and says that he is a Special Agent with the United States Social Security Administration ("SSA"), Office of Inspector General, and charges as follows:

**COUNT ONE**
**(Theft of Government Funds)**

1. From in or about 1997 up to and including at least in or about 2017, in the Southern District of New York and elsewhere, GERARD SCPARTA, the defendant, embezzled, stole, purloined, and knowingly converted to his use and the use of others, and without authority, sold, conveyed, and disposed of records, vouchers, money, and things of value of the United States and a department and agency thereof, to wit, the SSA, which exceeded the sum of $1,000, and received, concealed, and retained the same with intent to convert it to his use and gain, knowing it to have been embezzled, stolen, purloined, and converted, to wit, SCPARTA fraudulently obtained over approximately $638,000 in Social Security disability benefits to which he was not entitled.

(Title 18, United States Code, Sections 641 and 2.)

**COUNT TWO**
**(False Statements)**

2. From in or about 1997 up to and including at least in or about 2017, in the Southern District of New York and elsewhere, GERARD SCPARTA, the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully made materially false, fictitious, and fraudulent statements and representations, to wit, SCPARTA submitted applications for and reports relating to Social Security disability benefits in which he falsely stated, among other things, that he was disabled, could not work, and had no earnings, when in fact he worked as a security guard and host at a strip club located in Manhattan, New York (the "Strip Club") from in or about April 2004 through at least in or about December 2017, earning a total of over approximately $1.6 million.

(Title 18, United States Code, Sections 1001(a) and 2.)

**COUNT THREE**
**(False Statements in Connection with Social Security Disability Benefits)**

3. From in or about 1997 up to and including at least in or about 2017, in the Southern District of New York and elsewhere, GERARD SCPARTA, the defendant, made and caused to be made false statements and representations of a material fact in an application for payment and for a disability determination under Subchapter II of Chapter 7 of Title 42 of the United States Code (the "Subchapter"), and made and caused to be made false statements and representations of a material fact for use in determining rights to payment under the Subchapter, to wit, SCPARTA submitted applications for and reports relating to Social Security disability benefits in which he falsely stated, among other things, that he was disabled, could not work, and had no earnings, when in fact he worked as a security guard and host at the Strip Club from in or about April 2004 through at least in or about December 2017, earning a total of over approximately $1.6 million

(Title 42, United States Code, Sections 408(a)(2) and (a)(3); Title 18, United States Code, Section 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

4. I am a Special Agent with the SSA, Office of Inspector General, and have been employed in this capacity for over 17 years. I have personally participated in the investigation of this matter. This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, witnesses, and others, as well as my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## Overview

5. From my training and experience, I have learned that the SSA administers Social Security Disability Insurance ("SSD"), a federal benefits program that provides monthly cash benefits to individuals who have worked in the past and paid into Social Security, but who can no longer engage in any substantial gainful activity due to medical disabilities. SSD is a disability benefit available only to individuals who have a qualifying disability and are unable to work in any profession. In order to receive SSD, a beneficiary must certify that he or she is incapable of performing any gainful activity due to the stated disability. In addition, a beneficiary must report to the SSA all sources of income from work activity and any changes in the beneficiary's medical condition. These factors are then taken into account in determining whether the beneficiary is entitled to payments and the amount of those payments.

6. Between in or about 1986 and in or about 1997, GERARD SCPARTA, the defendant, worked as a police officer with the New York City Police Department ("NYPD"). In or about 1997, after reportedly sustaining an injury, SCPARTA was referred to an

individual ("CC-1")[1] who helped him fraudulently obtain SSD benefits. Specifically, CC-1 submitted SSD application materials signed by SCPARTA to the SSA that falsely stated, among other things, that SCPARTA suffered from severe depression and anxiety, could not do anything around his house, and was unable to work in any capacity. In addition, CC-1 coached SCPARTA to make the same false statements to physicians that examined SCPARTA for the purpose of establishing his disability and submitting reports to the SSA. Based on these false statements and representations by SCPARTA in documents and reports submitted to the SSA, the SSA approved SCPARTA to receive SSD benefits from in or about 1997 onward.

7. In addition to lying about his disability status and inability to work, GERARD SCPARTA, the defendant, falsely claimed on multiple forms submitted to the SSA that he did not work, and failed to report earnings from employment as required. In fact, from in or about April 2004 up to and including at least in or about December 2017, SCPARTA worked as a security guard and host at the Strip Club, earning a total of over approximately $1.6 million.

8. In order to conceal his income from working at the Strip Club and prevent the SSA from discovering his fraud, GERARD SCPARTA, the defendant, arranged for his income from the Strip Club to be paid to a third-party corporate entity owned by his wife.

9. From in or about 1997 up to and including in or about 2017, GERARD SCPARTA, the defendant, received a total of over approximately $638,000 in SSD benefits for himself, his wife, and his children, during which SCPARTA earned approximately $1.6 million from his work at the Strip Club.

<u>The Scheme to Obtain Disability Benefits</u>

10. Based on my review of records maintained by the NYPD, I have learned that, in or about July 1987, GERARD SCPARTA, the defendant, began working as a police officer with the NYPD in

---

[1] CC-1 has pleaded guilty to grand larceny in New York State Court for his involvement in this scheme to defraud the SSA, which involved more than 100 retired NYPD officers and New York City Fire Department firefighters.

the 1st Precinct in Manhattan. In or about February 1997, at the age of 32, SCPARTA stopped working for the NYPD because he claimed that he was no longer able to perform any type of work activity due to a disability.

11. Based on my conversations with a cooperating witness ("CW-1")[2], I have learned the following, in substance and in part:

a. Between in or about 1987 and in or about 1990, GERARD SCPARTA, the defendant, and CW-1 both worked together as NYPD officers on a taskforce in the 1st Precinct in Manhattan.

b. Between approximately in or about 1992 and in or about 2012, CW-1 referred NYPD police officers to CC-1 so that CC-1 could assist the officers to defraud the SSA by submitting applications for SSD that contained false statements regarding purported disabilities. Because officers who had sustained legitimate injuries while working could still perform certain types of work, many of the officers referred to CC-1 by CW-1 falsely stated to the SSA that they were depressed and/or had mental health issues in order to certify that they were incapable of performing any gainful activity. In exchange for referring these officers to CC-1, CW-1 received four months of the disability benefits received by any officer who was approved to receive benefits.

c. In or about 1997, approximately one year prior to SCPARTA's submission of an application for SSD benefits to the SSA, CW-1 referred SCPARTA to CC-1. Specifically, CW-1 escorted SCPARTA to CC-1's residence for meetings on approximately three or four occasions over the course of a year. During these meetings, CC-1 explained the following to SCPARTA, in substance and in part: (1) it would take approximately one year to build a case for SSD benefits; (2) CC-1 would handle all the paperwork submitted to the SSA on SCPARTA's behalf; (3) SCPARTA should

[2] Like CC-1, CW-1 has pleaded guilty to grand larceny in New York State Court for his involvement in this scheme to defraud the SSA. CW-1 is cooperating with law enforcement with the hope of receiving a more lenient sentence. Information provided by CW-1 has proven reliable, and has been corroborated, in part, by independent evidence, including, but not limited to, the SSA records described herein.

maintain a "low profile" once the application for SSD benefits was submitted in case he was being watched by the SSA during its evaluation of his disability; and (4) when visiting doctors, SCPARTA should pretend that he was disabled by, among other things, acting depressed and stating that he suffered from severe anxiety and panic attacks, did not socialize, and could not work or do anything around the house. During one of the meetings with CC-1, SCPARTA signed paperwork prepared by CC-1 that was submitted to the SSA, including a disability questionnaire.

d. CC-1 referred SCPARTA to a psychiatrist (the "CC-1 Doctor") to visit every approximately six weeks in connection with SCPARTA's purported depression and anxiety.

e. CC-1 also worked with an attorney ("CW-2")[3] who would assist SCPARTA if there were a need for a hearing on SCPARTA's eligibility for SSD benefits.

f. As instructed by CW-1, after SCPARTA was approved to receive SSD benefits, SCPARTA paid CW-1 a total of 13 months of the SSD benefits he received in cash increments of approximately $3,000 to $4,000. CW-1 then paid CC-1 nine months of those SSD benefits and kept the remaining four months for himself.

SCPARTA's False Statements and Representations to the SSA

12. Based on my review of records maintained by the SSA related to GERARD SCPARTA, the defendant, I have learned the following, in substance and in part:

a. On or about May 18, 1998, SCPARTA submitted an application for SSD benefits (the "SSD Application") to the SSA in which he claimed a disabling condition from "depression . . . severe anxiety[, and] [i]nternal derangement and degenerative arthritis left knee" that had limited his ability to work since on or about February 28, 1997. The SSD Application indicated that it had been submitted by CW-2 on behalf of SCPARTA and

[3] CW-2 has pleaded guilty to conspiracy in the fourth degree in New York State Court for his involvement in this scheme to defraud the SSA. CW-2 is also cooperating with law enforcement with the hope of receiving a more lenient sentence.

included nine medical reports written by the CC-1 Doctor from in or about March 1997 through in or about May 1998. In the SSD Application, SCPARTA agreed to the following reporting responsibilities and statements:

> I agree to promptly notify Social Security if:
>
> - My MEDICAL CONDITION IMPROVES so that I would be able to work, even though I have not yet returned to work.
>
> - I GO TO WORK whether as an employee or a self-employed person. . . .
>
> The above events may affect my eligibility or disability benefits as provided in the Social Security Act, as amended.

SCPARTA signed the SSD Application below the following statement:

> I know that anyone who makes or causes to be made a false statement or representation of material fact in an application or for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal law by fine, imprisonment, or both. I affirm that all information I have given in this document is true.

b. In a "Disability Report" dated May 18, 1998, SCPARTA stated the following, in substance and in part, in response to a question asking how his condition limited his ability to work: "I usually nap on and off during the day. I have the radio or television on for company, but I don't watch any particular program. I no longer read because I can't concentrate. My memory is poor. I have no interest in anything[.] I stay to myself and avoid people." SCPARTA further stated, in substance and in part, that he was "unable to perform any type of work activity either in or out of the house," that he "no longer drive[s] an automobile," and that he "can't take public transportation." SCPARTA signed the report under the following statement: "Knowing that anyone making a false statement or representation of a material fact for use in

determining a right to payment under the Social Security Act commits a crime punishable under Federal law, I certify that the above statements are true."

c. In a "Clinical Update" dated June 27, 1998 completed by the CC-1 Doctor and submitted to the SSA by CW-2 on behalf of SCPARTA, the CC-1 Doctor stated the following, in substance and in part:

> [SCPARTA] was examined on 06-27-98. He came driven by a friend and was casually dressed. . . . [H]e described his mood as depressed as before, and he looked quite worried. He couldn't tell he was in Baldwin, for his examination.
>
> He recalled remote events fairly, but couldn't remember any of the last four vice presidents of the United States. He also had trouble repeating (207-3684) even immediately after told. [. . . ]
>
> He reported that during the day, all he does is sit around his house, looking out the windows, with nothing to do and nothing good to look forward to. None of the activities and hobbies he previously enjoyed, currently mean anything to him. He stopped helping with the household chores, the way he did before. . . .
>
> He has difficulty both falling and staying asleep. [H]is energy level, appetite,and sex drive are all markedly diminished.
>
> Diagnosis: Depression, severe, with severe anxiety.

d. In a "Progress Note" dated November 23, 1998 completed by the CC-1 Doctor and submitted to the SSA as part of a supplemental submission by CW-2 on behalf of SCPARTA, the CC-1 Doctor stated the following, in substance and in part:

> [SCPARTA] was examined on 11-23-98. He said he no longer cares about himself or anybody else, as there is no relief in sight from his current depression and anxiety.
>
> He is home all day, sitting around, doing nothing. He stopped participating in the household chores, leaving them all to his family members.
>
> He now prefers to isolate himself in a room, to avoid dealing with others, because he is constantly uptight, short tempered and impulsive. . . .
>
> He is dissatisfied with his sleeping pattern, appetite, energy level, and sex drive.
>
> DIAGNOSIS: Depression, severe, with severe anxiety. In my opinion he remains severely incapacitated by his conditions, and unable to be gainfully employed.

e. On or about March 12, 1999, based on the SSD Application submitted by SCPARTA, the SSA approved SCPARTA to receive SSD benefits from February 28, 1997 onward.

f. From in or about 2002 through at least December 2008, SCPARTA provided the SSA with periodic forms concerning his disability and employment status. For example, in or about 2007, in a form that stated it was completed by CW-2 and submitted to the SSA, SCPARTA stated, among other things, that he "nap[s] on and off during the day" and "do[esn't] have an interest in anything," that he is "severely depressed" and "get[s] panic attacks," and that he is "unable to do anything in or out of the house." SCPARTA further stated in the same form that he "tr[ies] to avoid being around other people" and "do[esn't] have any social life."

g. On or about April 12, 2012, SCPARTA submitted a "Function Report" to the SSA in which he represented he was "unable to do anything in or out of the house" and that his wife was "always after [him] to shower and shave." SCPARTA signed this report under bolded language stating the following:

"Anyone making a false statement or representation of a material fact for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal law."

h. On or about August 13, 2014, the SSA sent SCPARTA a letter titled "Important Information" which stated the following, in substance and in part: "It is important that you report changes right away. Be sure to tell us about any of the following changes: You return to work."

i. On or about November 17, 2016, SCPARTA reported to the SSA for an interview related to his continued receipt of SSD benefits. During this interview, SCPARTA filled out a number of forms related to his continued receipt of SSD benefits as described below:

i. SCPARTA filled out and signed a "Work Activity Report - Employee" (the "Employee Work Activity Report") which contained instructions to "use this form to describe your work activity" and inquired whether SCPARTA "had any employment or wages" since February 28, 1997. In the Employee Work Activity Report, SCPARTA checked a box indicating he had no employment income or wages. SCPARTA signed the Employee Work Activity Report under the following statement:

> I declare under penalty of perjury that I have examined all the information on this form, and on any accompanying statements or forms, and it is true and correct to the best of my knowledge. I understand that anyone who knowingly gives a false or misleading statement about a material fact in this information . . . commits a crime and may be sent to prison, or may face other penalties, or both.

ii. SCPARTA filled out and signed a "Work Activity Report - Self-Employment" (the "Self-Employment Work Activity Report") which contained instructions to "use this form to describe your work activity" and inquired whether SCPARTA "had any self-employment income" since February 28, 1997. In the Self-Employment Work Activity Report, SCPARTA checked a box indicating he had no self-employment income. SCPARTA signed the

Self-Employment Work Activity Report under the following statement:

> I declare under penalty of perjury that I have examined all the information on this form, and on any accompanying statements or forms, and it is true and correct to the best of my knowledge. I understand that anyone who knowingly gives a false or misleading statement about a material fact in this information . . . commits a crime and may be sent to prison, or may face other penalties, or both.

iii. SCPARTA filled out and signed a "Continuing Disability Review Report" (the "CDR Report") in which he stated the following regarding what he does in a "typical day": "Get up at 11:00"; "have coffee"; "Watch TV"; "try to sleep." SCPARTA also stated that he did not have any hobbies or interests. Finally, SCPARTA answered "Yes" in response to questions asking whether he had difficulty taking medicines, preparing meals, managing money, concentrating, and remembering.

iv. In connection with the November 17, 2016 interview, SCPARTA also signed a statement certifying the following: "I acknowledge that I have voluntarily provided truthful responses and information to all questions, verbal or written, related to my past and current medical condition and work or employment activity."

j. On or about January 13, 2017, SCPARTA informed the SSA that he had begun working at the Strip Club as a "Greeter" on or about January 1, 2017 and that he was working approximately 18 hours per week at a rate of $20.00 per hour (a total of $1,440 per month). As a result, on or about November 18, 2017, the SSA notified SCPARTA that he was no longer entitled to SSD benefits beginning in or about January 2018.

<u>SCPARTA's Work as a Security Guard at the Strip Club</u>

13. Based on my interview of the owner and manager of a company that provided security at the Strip Club (the "Security Company"), as well as my review of records provided by the

Security Company, I have learned the following, in substance and in part:

a. The Security Company has provided security services for several bars and restaurants in the New York City area, including the Strip Club.

b. From at least in or about April 2004 through at least in or about January 2007, GERARD SCPARTA, the defendant, worked as a security guard or "bouncer" at the Strip Club. SCPARTA's duties included access and egress control, responding to disorderly customers, and checking identification of customers, among other duties. At times, SCPARTA also worked as a room administrator of private rooms at the Strip Club, and his duties included collecting money from customers and keeping track of time and alcohol sales.

c. From at least in or about April 2004 through at least in or about January 2007, SCPARTA worked as security guard at the Strip Club on approximately 260 days, earning a total of over approximately $48,000.

d. The Security Company made the payments for SCPARTA's work to his wife in the name of the limited liability company M.E.S. Consulting, LLC ("MES Consulting"), which contains the initials of SCPARTA's wife and was registered at SCPARTA's residence.

e. SCPARTA's wife never performed any work for the Security Company.

f. After approximately January 2007, SCPARTA began working directly for the Strip Club as a host.

SCPARTA's Work as a Host at the Strip Club

14. Based on my interview of a manager and bookkeeper for the Strip Club, as well as my review of records provided by the Strip Club, I have learned the following, in substance and in part:

a. GERARD SCPARTA, the defendant, began working at the Strip Club in security and then became a host working as an independent contractor.

b. As a host, SCPARTA greeted customers, served as the liaison between female entertainers and customers, and was responsible for taking care of guests at tables or VIP rooms. For example, SCPARTA was responsible for taking customers' cash or credit cards to the cashier and returning their receipts for signatures. Hosts at the Strip Club generally worked standing up and frequently walked around the Strip Club.

c. While his shifts varied, SCPARTA generally worked every other Monday, every Tuesday from 6:00 p.m. to 3:30 a.m., every Wednesday from 6:00 p.m. to 3:30 a.m., and every Thursday from 8:00 p.m. to 3:30 a.m.

d. SCPARTA did not receive a salary from the Strip Club and was paid through gratuities he received from customers or the female entertainers in the form of cash, credit card tips, or "Beaver Bucks," the Strip Club's internal form of currency. SCPARTA kept the entirety of any gratuities he received in cash, and the Strip Club paid SCPARTA 70% of the credit card gratuities, which were pooled and split amongst the hosts, and $0.70 cents for each Beaver Buck that SCPARTA redeemed.

e. From in or about 2009 through in or about 2016, the Strip Club paid SCPARTA the following amounts for gratuities SCPARTA earned from credit cards tips and Beaver Bucks:

| | |
|---|---|
| 2009 | $ 240,038 |
| 2010 | $ 202,231 |
| 2011 | $ 177,920 |
| 2012 | $ 202,440 |
| 2013 | $ 201,144 |
| 2014 | $ 162,265 |
| 2015 | $ 377,024 |
| 2016 | $ 89,627 |
| **Total** | **$ 1,652,689** |

f. The Strip Club required hosts to have a limited liability company or an S-corporation, and hosts were responsible for tracking their own earnings. SCPARTA provided the Strip Club with information for the limited liability

company in his wife's name, MES Consulting, which was registered at SCPARTA's residence during his work at the Strip Club.

15. As part of my investigation, other law enforcement agents and I have conducted surveillance of GERARD SCPARTA, the defendant, and I have observed him at the Strip Club on numerous occasions.

a. For example, on or about March 1, 2016, I observed SCPARTA park a vehicle registered to his wife (the "Scparta Vehicle") outside the Strip Club and enter the Strip Club wearing a white dress shirt.

b. On or about March 10, 2016, the Scparta Vehicle was parked outside of the Strip Club, and another law enforcement agent and I entered the Strip Club in plainclothes. When I inquired with an employee regarding setting up a party, the female employee introduced SCPARTA to me as the "host." SCPARTA was wearing a white dress shirt, sports jacket, and a radio earpiece, and he introduced himself to me as "Gerard." SCPARTA then explained, in substance and in part, that there was a price list to review and that I should speak with him if I needed anything. Over approximately one hour, I observed SCPARTA interacting with other employees, greeting guests at the front entrance, and walking through the Strip Club.

c. On or about March 2 and December 8, 2016, and July 12, 2017, I observed the Scparta Vehicle parked outside of the Strip Club.

16. Based on my review of tax return documents jointly filed by GERARD SCPARTA, the defendant, and his wife with the Internal Revenue Service ("IRS") from in or about 2012 through in or about 2016, and my review of a report of an interview with the tax preparer (the "Preparer") who filed the tax return documents, I have learned the following, in substance and in part:

a. The Preparer has prepared tax returns for SCPARTA and his wife for the last six to nine years. SCPARTA and his wife typically meet together with the Preparer once a year regarding their tax returns.

b. SCPARTA and his wife represented the following to the Preparer regarding MES Consulting:

i. SCPARTA's wife was the owner of MES Consulting.

ii. SCPARTA's wife was the only individual working for MES Consulting and her duties included providing security at a strip club.

iii. SCPARTA could not work for MES Consulting due to his disability and had no role at MES Consulting.

c. The joint tax returns filed by SCPARTA and his wife included a Schedule C, "Profit or Loss From Business," for MES Consulting, which listed his wife as the "Proprietor" and the business as "security." The following gross receipts or sales for the tax years of 2012 through 2016 were reported for MES Consulting:

| | |
|---|---|
| 2012 | $ 198,320 |
| 2013 | $ 199,585 |
| 2014 | $ 165,262 |
| 2015 | $ 481,652 |
| 2016 | $ 412,992 |
| **Total** | **$ 1,457,811** |

d. SCPARTA and his wife did not otherwise report any "wages, salaries, tips, etc." on their joint tax returns for the tax years of 2012 through 2016.

WHEREFORE, I request that a warrant be issued for the arrest of GERARD SCPARTA, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

PETER DOWD
Special Agent
Social Security Administration
Office of Inspector General

Sworn to before me this
6th day of April, 2018

THE HONORABLE HENRY B. PITMAN
United States Magistrate Judge
Southern District of New York